Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Attorneys for Plaintiff PL01 and the Proposed Classes*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| PL01, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EDUCATIONAL TESTING SERVICE,<br><br>Defendant. | Case No. 2:26-cv-12163<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Negligence;<br>(2) Negligence Per Se;<br>(3) Breach of Fiduciary Duty;<br>(4) Unjust Enrichment;<br>(5) Declaratory and Injunctive Relief, 28 U.S.C. § 2201;<br>(6) Invasion of Privacy, Cal. Const. art. I, § 1;<br>(7) Cal. Bus. & Prof. Code § 17200, *et seq.*<br><br>ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff PL01 ("Plaintiff" or "PL01"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Educational Testing Service ("ETS" or "Defendant"). Plaintiff alleges the following upon personal knowledge as to Plaintiff and Plaintiff's own acts and experiences and, as to all other matters, upon information and belief, including the investigation of counsel and review of public statements issued by Defendant and the California Department of Education.

## I. NATURE OF THE ACTION

1. This class action arises from Defendant ETS's failure to protect the sensitive personal information of millions of current and former California public school students—most of them children—whose data ETS holds because the State of California requires those students to take standardized tests that ETS administers.

2. ETS is a nonprofit assessment organization that contracts with the State of California to provide the state- and federally-required testing given to all students enrolled in California public schools, including the California Assessment of Student Performance and Progress ("CAASPP") and the English Language Proficiency Assessments for California ("ELPAC").[1] In that role, ETS maintains student demographic, program-participation, and assessment data.[2]

3. On September 25, 2026, ETS identified unauthorized activity on a secure file transfer protocol ("SFTP") site that ETS operated to exchange California statewide assessment information with the California Department of Education ("CDE") (the "SFTP Site"). ETS's investigation determined that an unauthorized party used a single compromised login credential to access the

---

[1] Cal. Dep't of Educ., *Educational Testing Service (ETS) Incident*, https://www.cde.ca.gov/nr/in/ets-incident.asp (last visited Oct. 17, 2026) (the "CDE Incident Page").

[2] *Id.*

SFTP Site and copy files containing California student information at various times between May 22, 2026 and September 18, 2026 (the "Data Breach").[3] In other words, a criminal had access to ETS's repository of California student data for approximately four months, and ETS did not detect it until a week after the last known intrusion.

4. The stolen information is extraordinarily sensitive. Although the information accessed and copied varied by individual, it could include students' names, dates of birth, residential addresses, schools, districts, and grade levels; Statewide Student Identifiers and local student identifiers; gender, race or ethnicity, primary language, country of origin, and English-learner status; disability and Section 504 status, testing accommodations, and primary disability type; eligibility for federal programs for low-income, migrant, homeless, and military-connected students; and English-proficiency and statewide assessment results (collectively, the "Student Data").[4]

5. The scope of the Data Breach is staggering. According to CDE, the stolen files contained information about all students enrolled in California public schools in the three previous school years, as well as students who left a California school as far back as 2006 without confirming a transfer to another school.[5] The Los Angeles Times reported that the breach reaches well beyond California's roughly 5.7 million current public-school students.[6]

---

[3] Cal. Dep't of Educ., *Educational Testing Service (ETS) Notification*, https://www.cde.ca.gov/nr/in/ets-notification.asp (last visited Oct. 17, 2026) (the "Notice of Data Breach").

[4] *Id.*; CDE Incident Page, *supra*.

[5] CDE Incident Page, *supra*.

[6] Howard Blume, Andrew Khouri & Jaweed Kaleem, *Hackers Steal Personal Data of Millions of California Students in Massive Breach*, L.A. Times (Oct. 16, 2026), https://www.latimes.com/california/story/2026-10-16/state-testing-student-data-hack (the "L.A. Times Article").

6. The Data Breach was the predictable result of ETS's failure to implement basic, industry-standard safeguards. As one cybersecurity expert observed, a stolen login credential should not become "a months-long passport to millions of students' personal records."[7] Reasonable access controls—including multi-factor authentication, restrictions on where and how the SFTP Site could be accessed, least-privilege permissions, and prompt deletion of files once transferred—together with basic monitoring capable of detecting a months-long pattern of unauthorized downloads, would, upon information and belief, have prevented the Data Breach or substantially limited its scope.

7. Plaintiff and Class Members did not choose to entrust their information to ETS. California law requires every local educational agency to administer the statewide assessments to each of its pupils, Cal. Educ. Code § 60640(f)(1), and the Student Data at issue covered all students enrolled in California public schools in the three previous school years. Students' information thus flowed to ETS as a consequence of attending public school. Plaintiff and Class Members—most of whom were minors when their data was collected—had no ability to evaluate ETS's security practices, negotiate for better protections, or opt out.

8. As a result of the Data Breach, Plaintiff and Class Members have suffered, and will continue to suffer, concrete harm, including the loss of privacy in highly sensitive information; a substantial and imminent risk of identity theft, fraud, phishing, and other targeted scams; lost time and expenses spent mitigating these risks; and emotional distress. Because much of the stolen information—such as a child's date of birth, disability status, country of origin, and history of

---

[7] L.A. Times Article, *supra* (quoting Anton Dahbura, executive director of the Johns Hopkins University Information Security Institute).

homelessness—cannot be changed, these harms will follow Class Members for years.

9. Plaintiff brings this action on behalf of a nationwide class and a California subclass to recover damages and to obtain equitable relief requiring ETS to implement reasonable data security practices to protect the Student Data that remains in its possession.

## II. PARTIES

10. Plaintiff PL01 was enrolled in a California public school. ETS collected and maintained PL01's Student Data in connection with California's statewide assessment programs, and PL01's Student Data was accessed and copied in the Data Breach. Plaintiff is a citizen of California and resides in Los Angeles County, California.

11. Defendant Educational Testing Service is a nonprofit corporation organized under the laws of the State of New York, with its headquarters and principal place of business at 660 Rosedale Road, Princeton, New Jersey 08541.[8] ETS is a citizen of New York and New Jersey for purposes of 28 U.S.C. § 1332. ETS administers statewide assessments to California public school students under contract with the State of California and conducts substantial business in California, including in this District.

---

[8] *See* ETS, *Our Locations*, https://www.ets.org/about/locations.html (last visited Oct. 17, 2026) (identifying ETS headquarters at 660 Rosedale Road, Princeton, New Jersey 08541, and an ETS office at 1610 R Street, Suite 300, Sacramento, California 95811); Educational Testing Service, Inc., Ky. Sec'y of State Bus. Entity Profile, https://sosbes.sos.ky.gov/BusSearchNProfile/Profile.aspx/?ctr=339514 (last visited Oct. 17, 2026) (listing ETS as a nonprofit corporation incorporated in New York with its principal office in Princeton, New Jersey).

## III. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 members in the proposed classes; and at least one member of the proposed classes, including Plaintiff, is a citizen of a State different from Defendant. Defendant is a citizen of New York and New Jersey, and Plaintiff is a citizen of California. The exceptions set forth in 28 U.S.C. § 1332(d)(3) and (d)(4) do not apply because Defendant is not a citizen of California.

13. This Court has personal jurisdiction over Defendant because Defendant purposefully directed its activities toward California and this claim arises out of and relates to those activities. ETS contracted with the State of California to administer California's statewide student assessments; collected, received, maintained, and exchanged the Student Data of California students, including students in this District, in connection with that contract; and caused injury to Plaintiff and Class Members in California. ETS also maintains an office in Sacramento, California.[9]

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including the injury Plaintiff suffered in this District, where Plaintiff resides. ETS administers California's statewide assessments to students enrolled in public schools located in this District, and, upon information and belief, ETS maintained the Student Data of a substantial number of Class Members who attended public schools in this District and who reside here. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because

---

[9] ETS, *Our Locations*, https://www.ets.org/about/locations.html (last visited Oct. 17, 2026).

Defendant is subject to personal jurisdiction in this District with respect to this action.

15. Assignment to the Western Division is appropriate because Plaintiff resides in Los Angeles County.

## IV. FACTUAL ALLEGATIONS

### A. ETS Administers California's Mandatory Statewide Student Assessments and Maintains Sensitive Data About Millions of Students

16. ETS describes itself as a nonprofit assessment organization. Under contract with the State of California, ETS provides the state- and federally-required testing administered to all students enrolled in California public schools, and supports California's statewide assessment programs, including the CAASPP and the ELPAC.[10]

17. These assessments are mandated by state and federal law. California law requires each local educational agency to administer the CAASPP to each of its pupils, including pupils with exceptional needs, Cal. Educ. Code § 60640(f)(1), (k), and requires school districts to assess the English language development of each English-learner pupil using the ELPAC, Cal. Educ. Code § 313(a); *see id.* § 60810. Although a parent may submit a written request to excuse a child from the CAASPP, Cal. Educ. Code § 60615, the Student Data compromised in the Data Breach was not limited to students who sat for an assessment: it encompassed all students enrolled in California public schools in the three previous school years, together with enrollment, demographic, and program-participation information transmitted to ETS by virtue of each student's enrollment.

---

[10] CDE Incident Page, *supra*.

18. ETS's work under its contracts with the State is substantial. In July 2021, CDE sought approval from the State Board of Education to negotiate with ETS for a California Assessment System contract covering five administrations of the CAASPP and ELPAC, running from July 1, 2022 through December 31, 2027. CDE noted that the 2021–22 Budget Act alone provided approximately $87 million for CAASPP contract activities and approximately $23.7 million for ELPAC contract activities.[11] ETS is compensated with public funds for this work: California law directs the State Board of Education to establish annually the amount each assessment contractor is paid for each test administered under those contracts. Cal. Educ. Code § 60640(l)(2).

19. To perform this work, ETS maintains student demographic, program-participation, and assessment data in connection with California's statewide assessment programs.[12] ETS also operated the SFTP Site, which was used to exchange California statewide assessment information with CDE.[13]

20. The data ETS maintains about California students is among the most sensitive information that exists about a child. It identifies a student by name, date of birth, and home address; links that identity to a permanent, state-issued Statewide Student Identifier ("SSID") and a local student identifier; and attaches to that identity information about the student's race or ethnicity, primary language, country of origin, English-learner status, disability status, Section 504 status, testing accommodations, primary disability type, and eligibility for federal

---

[11] Cal. State Bd. of Educ., *California Assessment System Request for Qualifications, Stage Four—Negotiations with the Highest Ranked Potential Contractor Educational Testing Service*, Agenda Item No. 4 (July 2021), https://www.cde.ca.gov/be/ag/ag/yr21/documents/jul21item04.docx (last visited Oct. 17, 2026).

[12] CDE Incident Page, *supra*.

[13] Notice of Data Breach, *supra*.

programs that serve low-income, migrant, homeless (McKinney-Vento), and military-connected students.[14]

21. An SSID is a unique, randomly generated ten-digit number assigned to an individual student within the California public K-12 educational system.[15] Because it is assigned to a student for the entirety of the student's time in California public schools, an SSID functions as a persistent identifier that links a student to the student's educational records across schools, districts, and years.

**B. ETS Promised to Safeguard Student Data**

22. ETS publicly represents that it protects the personal information entrusted to it. ETS's Privacy Notice states that it applies not only to information ETS collects through its websites, but also to personal information ETS receives "from a school or test center administrator."[16]

23. ETS represents that it "has established safeguards to help prevent unauthorized access to or misuse of your Personal Information," including "physical, technical, organizational and administrative controls."[17] ETS further represents that it maintains "an established records retention program" and retains personal information only "as needed" for the purposes described in its Privacy Notice.[18]

24. In a "Special Notice to California Residents," ETS asserts that, although it does not consider itself directly subject to the California Consumer Privacy Act because it is a nonprofit, it is "deeply committed to protecting the

---

[14] *Id.*

[15] CDE Incident Page, *supra*.

[16] ETS, *Privacy and Security* (last updated Jan. 19, 2024), https://www.ets.org/legal/privacy.html (last visited Oct. 17, 2026) (the "ETS Privacy Notice").

[17] *Id.*

[18] *Id.*

privacy and security" of the personal information entrusted to it and maintains a global privacy program that protects personal information "no matter how or where it is collected, used or stored."[19]

25. ETS's K-12 Student Data Privacy Statement goes further. It represents that ETS "protects K-12 Student Data at all times using appropriate security measures, including encryption," and that ETS "does not retain K-12 Student Data longer than needed to fulfill the educational purposes for which it was collected."[20]

26. After the Data Breach became public, an ETS spokesperson told the Los Angeles Times that ETS "maintains a comprehensive information security program that is regularly assessed by third parties."[21] As set forth below, ETS's security program was not adequate to protect Student Data from a single compromised credential.

**C. The Data Breach**

27. On September 25, 2026, ETS identified unauthorized activity involving the SFTP Site. ETS then disabled the account involved, took the SFTP Site offline, and initiated an investigation with external cybersecurity experts.[22]

28. ETS's investigation determined that an unauthorized party used a compromised login credential to access the SFTP Site and copy files containing California student information at various times between May 22, 2026 and September 18, 2026.[23]

---

[19] *Id.*

[20] ETS, *K-12 Student Data Privacy Statement* (last updated Feb. 4, 2025), https://www.ets.org/legal/privacy/k-12-student-data-privacy-statement.html (last visited Oct. 17, 2026) (the "K-12 Privacy Statement").

[21] L.A. Times Article, *supra*.

[22] CDE Incident Page, *supra*.

[23] *Id.*; Notice of Data Breach, *supra*.

29. Thus, for nearly four months, an unauthorized actor repeatedly accessed the SFTP Site using a compromised login credential and copied files containing Student Data, and ETS did not detect that activity. ETS did not identify the unauthorized activity until September 25, 2026—a week after the last known instance of unauthorized access and copying.

30. On October 2, 2026, CDE notified county and district superintendents and charter school administrators that ETS had informed CDE and the State Board of Education of an incident involving ETS-operated systems; that state agencies were investigating; and that ETS had halted normal enrollment data processing and paused certain testing activities while the security of its systems was assessed.[24]

31. ETS, at the direction of CDE, began notifying affected students and families on or about October 16, 2026.[25] The Notice of Data Breach confirmed that the stolen information included "all students enrolled in the three previous school years," and that the information accessed and copied varied by individual but may include:[26]

(a) student name, date of birth, residential address, school, district, and grade level;

(b) Statewide Student Identifier and local student identifier;

(c) gender, race or ethnicity, primary language, country of origin, and English learner status;

---

[24] Letter from Mary Nicely, Deputy Superintendent of Pub. Instruction, Cal. Dep't of Educ., to County and District Superintendents and Charter School Administrators, *Vendor Incident Report* (Oct. 2, 2026), https://www.cde.ca.gov/nr/in/yr26inltr1002.asp (the "October 2 Letter").

[25] Cal. Dep't of Educ., *ETS Begins Notifying California Students and Families Following Data Security Incident* (Oct. 16, 2026), https://www.cde.ca.gov/nr/ne/yr26/yr26rel45.asp (last visited Oct. 17, 2026).

[26] Notice of Data Breach, *supra*.

(d) disability and Section 504 status, testing accommodations, and primary disability type;

(e) eligibility status for Title I, Part A; Title I, Part C; McKinney-Vento; and Military Connected Student programs; and

(f) English language proficiency information and statewide assessment registration, participation, and results.

32. CDE has stated that the data accessed and copied did not include Social Security numbers, driver's license numbers, passport numbers, financial account information, credit or debit card information, or account passwords, and that the incident did not involve parent or guardian personal information.[27] The information that was taken is nonetheless highly sensitive: it ties each student's name, date of birth, and home address to a persistent state-issued identifier and to confidential educational, disability, demographic, and program-eligibility information.

33. CDE has confirmed that affected individuals include current and former students enrolled in California public schools between 2023 and the current school year, as well as students who left a California school since 2006 and did not confirm transfer to another school with CDE.[28] The Data Breach therefore affected not only current students but also former students—many now adults, and many of whom no longer live in California.[29]

[27] CDE Incident Page, *supra*.

[28] *Id.*

[29] *See id.* (confirming that the incident may affect former students, "including those who are now adults").

34. CDE has also cautioned that not receiving a notification letter does not necessarily mean that an individual's information was unaffected, particularly where contact information has changed.[30]

35. ETS has stated that it has taken steps to reduce the potential risk of the data being made publicly accessible and that, following regular web monitoring, it has not yet uncovered evidence that the information has been made public.[31] But ETS has not disclosed what those "steps" were, whether the criminal actor made a ransom or extortion demand, or whether ETS paid one. As the Los Angeles Times observed, hackers often keep stolen information confidential while a ransom demand is pending.[32] Upon information and belief, the stolen Student Data remains in the possession of the criminal actor(s) responsible for the Data Breach.

36. Following the Data Breach, ETS took the SFTP Site offline and built "an entirely new SFTP site with enhanced security controls,"[33] and an ETS spokesperson stated that ETS had implemented "enhanced monitoring, strengthened access controls and further third-party review" of its security practices.[34] Upon information and belief, comparable measures were available to ETS, and feasible, before the Data Breach.

37. CDE and the State Board of Education have announced that they are reviewing the incident and ETS's compliance with applicable data security and contractual requirements.[35]

---

[30] *Id.*

[31] *Id.*

[32] L.A. Times Article, *supra*.

[33] CDE Incident Page, *supra*.

[34] L.A. Times Article, *supra*.

[35] CDE Incident Page, *supra*.

38. ETS has offered affected individuals only 24 months of identity-protection services through Experian IdentityWorks.[36] That offer is inadequate. Much of the Student Data—including dates of birth, disability information, country of origin, and history of homelessness or federal program eligibility—is permanent and cannot be changed. And because many Class Members are young children, the stolen information may not be misused until years from now, when those children first apply for credit, employment, financial aid, or housing—long after ETS's two-year offer expires.

**D. ETS Failed to Implement Reasonable and Industry-Standard Security Measures**

39. The Data Breach was the direct result of ETS's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the Student Data. ETS has not publicly disclosed the details of its security architecture. But the circumstances of the Data Breach—an unauthorized party's use of a single compromised login credential to access the SFTP Site at various times over nearly four months, and to copy files containing information about millions of students, without detection—support a reasonable inference that ETS's safeguards were deficient. Upon information and belief, ETS failed to, among other things:

(a) require multi-factor authentication for access to the SFTP Site, such that a single compromised login credential was sufficient to access files containing the Student Data of millions of students;

(b) restrict access to the SFTP Site to known, authorized users, devices, and network locations (for example, through IP allowlisting or similar controls);

[36] *Id.*

(c) implement adequate credential-management practices, including periodic credential rotation and prompt revocation of credentials that were compromised or no longer needed;

(d) limit the permissions of the compromised account to the minimum access necessary to perform its function (the principle of least privilege);

(e) promptly remove files from the SFTP Site after they were transferred, rather than allowing large volumes of Student Data to remain available for download from an internet-accessible file-transfer server;

(f) encrypt the files containing Student Data at rest, or otherwise render the Student Data unreadable to an unauthorized party who obtained access to the SFTP Site;

(g) implement adequate logging, monitoring, and alerting capable of detecting anomalous logins and repeated large-volume downloads over a period of nearly four months;

(h) minimize the Student Data it collected and maintained, and, consistent with any applicable legal and contractual retention requirements, delete Student Data that was no longer needed for the purposes for which it was collected; and

(i) adequately train and supervise its personnel, and oversee its vendors and data-exchange partners, regarding credential security and the handling of Student Data.

40. Upon information and belief, the files on the SFTP Site were accessible to the unauthorized actor in a readable format, which allowed the actor to copy and use the Student Data.

41. Each of these safeguards is a basic, well-established, and inexpensive security practice. The Federal Trade Commission ("FTC") has long

advised organizations that hold personal information to know what information they hold, keep only what they need, protect the information they keep, properly dispose of what they no longer need, and plan ahead to respond to security incidents.[37]

42. The FTC's *Start with Security* guidance, which distills lessons from more than fifty FTC data security enforcement actions, is even more specific. It advises organizations to restrict access to sensitive data on a need-to-know basis; to consider two-factor authentication to protect against password compromises; to limit third-party access to their networks, for example by restricting connections to specified IP addresses; to use strong cryptography to protect sensitive information in storage and transmission; to monitor network activity and system logs for unauthorized access; and to hold information only as long as there is a legitimate business need.[38] The guidance specifically warns of the scenario that occurred here, describing an FTC enforcement action in which hackers stole a business client's remote login credentials and used them to obtain consumers' personal information.[39]

43. Other widely recognized security frameworks are to the same effect. The National Institute of Standards and Technology's Cybersecurity Framework is designed to help organizations understand and improve their management of

---

[37] Press Release, Fed. Trade Comm'n, *FTC Unveils Practical Suggestions for Businesses on Safeguarding Personal Information* (Mar. 19, 2007), https://www.ftc.gov/opa/2007/03/businessguidance_pii.htm (announcing *Protecting Personal Information: A Guide for Business*).

[38] Fed. Trade Comm'n, *Start with Security: A Guide for Business* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Oct. 17, 2026).

[39] *Id.* (describing *Premier Capital Lending*).

cybersecurity risk,[40] and the Center for Internet Security's Critical Security Controls identify core safeguards that include Data Protection, Account Management, Access Control Management, Audit Log Management, Network Monitoring and Defense, and Service Provider Management.[41] ETS's failures described above are inconsistent with each of these standards.

44. Indeed, a cybersecurity expert quoted by the Los Angeles Times explained that if a single stolen credential provided months-long access, the critical question is why authentication safeguards, access restrictions, and monitoring systems failed to detect and stop the unauthorized activity.[42] ETS's own post-breach measures—"enhanced monitoring" and "strengthened access controls"—indicate that such protections were available and feasible.

**E. The Data Breach Was Foreseeable**

45. ETS knew or should have known that the Student Data was a prime target for cybercriminals. Education technology vendors and school systems that aggregate student data have been repeatedly and publicly targeted in recent years.

46. In September 2022, the Los Angeles Unified School District suffered a cyberattack that forced it to shut down its computer systems; data stolen in that attack, including student assessment records, was later posted online.[43]

47. In December 2024, PowerSchool, a provider of student information systems to schools across the country, suffered a data breach that exposed the

---

[40] Nat'l Inst. of Standards & Tech., *Cybersecurity Framework*, https://www.nist.gov/cyberframework (last visited Oct. 17, 2026).

[41] Ctr. for Internet Sec., *CIS Critical Security Controls List*, https://cisecurity.atlassian.net/wiki/spaces/CSKB/pages/3672801620 (last visited Oct. 17, 2026).

[42] L.A. Times Article, *supra*.

[43] *See* L.A. Times Article, *supra*.

personal information of tens of millions of students and teachers. Plaintiffs in the resulting multidistrict litigation allege that the threat actor gained access using compromised credentials and that the breach could have been prevented had PowerSchool required multi-factor authentication. *See* Consol. Individual Users Class Action Compl. ¶¶ 9–10, *In re PowerSchool Holdings, Inc. & PowerSchool Grp., LLC Customer Sec. Breach Litig.*, No. 3:25-md-03149-BEN-MSB (S.D. Cal. Aug. 11, 2025), ECF No. 259.

48. In the spring of 2026, Instructure, Inc., the company behind the widely used Canvas learning management platform, suffered a cyberattack that temporarily took Canvas offline; plaintiffs in the resulting litigation allege that the attack exposed data relating to millions of students and educators.[44]

49. Given these highly publicized incidents—several involving compromised credentials—and given the volume and sensitivity of the Student Data it maintained, ETS knew or should have known of the risk that an unauthorized actor would attempt to access its systems, and of the importance of protecting access credentials and monitoring for unauthorized activity.

**F. The Data Breach Has Harmed and Will Continue to Harm Plaintiff and Class Members**

50. The Student Data is valuable to criminals precisely because it is detailed, accurate, and tied to children. A child's name, date of birth, and home address are core building blocks of identity. Because children typically do not have credit histories and do not monitor their credit, criminals can use a child's identifying information to fabricate "synthetic" identities or open accounts that may go undetected for years—often until the child first applies for a student loan, a job, or an apartment.

---

[44] *See* L.A. Times Article, *supra*; Consol. Class Action Compl. ¶¶ 1–4, *In re Instructure Data Breach Litig.*, No. 2:26-cv-00374-RJS-CMR (D. Utah Oct. 8, 2026), ECF No. 180.

51. The Student Data also enables targeted phishing and social-engineering schemes. Armed with a student's name, school, district, grade level, home address, and state student identifier, a criminal can impersonate a school, a testing organization, or a government agency with convincing specificity to extract additional information—such as Social Security numbers, passwords, or payment information—from students and their families. CDE itself has warned affected families to be cautious of unexpected emails, text messages, or phone calls referencing a student's school, statewide assessments, or the Data Breach; has encouraged affected individuals to enroll in identity-protection services and to remain alert to possible misuse of student personal information; and has advised parents and guardians to consider requesting credit freezes for affected children under 16 to help prevent unauthorized accounts from being opened in their names.[45]

52. Beyond financial fraud, the Data Breach exposed categories of information that carry a serious risk of stigma, discrimination, harassment, and exploitation if disclosed, including students' disability status and primary disability type, Section 504 status, country of origin, English-learner status, and eligibility for programs serving homeless, migrant, and low-income students. This information can be used to target vulnerable children and families, including through extortion. Its exposure is an invasion of privacy in and of itself, and the harm is permanent: unlike a credit card number, a child's disability history or country of origin cannot be canceled or reissued.

53. This injury has already occurred. The Student Data was not merely exposed to a potential risk of access: according to CDE, an unauthorized party actually accessed and copied the files containing it. That unauthorized intrusion into, and taking of, private records concerning Plaintiff and Class Members—

[45] CDE Incident Page, *supra*.

including information about their disabilities, their families' economic circumstances, and their housing status—is closely analogous to the harm long recognized at common law from intrusion upon seclusion, which protects against the highly offensive intrusion into a person's private affairs and concerns.

54. As a direct and proximate result of ETS's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury, including: (i) the unauthorized access, exfiltration, and disclosure of their Student Data; (ii) the loss of privacy and confidentiality in that information; (iii) a substantial and imminent risk of identity theft, fraud, and targeted phishing; (iv) out-of-pocket costs and lost time spent monitoring accounts, placing credit freezes, reviewing communications for fraud, and otherwise mitigating the effects of the Data Breach; (v) emotional distress, anxiety, and fear; and (vi) the continued risk to their Student Data, which remains in ETS's possession and is subject to further unauthorized disclosure absent adequate protective measures.

55. Plaintiff and Class Members have a continuing interest in ensuring that their Student Data, which upon information and belief remains in ETS's possession, is protected and safeguarded from future breaches.

## V. CLASS ACTION ALLEGATIONS

56. Plaintiff brings this action individually and on behalf of all others similarly situated under Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), on behalf of the following classes:

> **Nationwide Class**: All individuals residing in the United States as of the date this Complaint is filed whose personal information was contained in the files accessed and copied in the Data Breach, including all individuals to whom ETS or CDE sent a notice of the Data Breach.

> **California Subclass**: All individuals residing in California as of the date this Complaint is filed whose

personal information was contained in the files accessed and copied in the Data Breach, including all individuals to whom ETS or CDE sent a notice of the Data Breach.

57. The Nationwide Class and the California Subclass are referred to collectively as the "Classes," and their members as "Class Members." Because the Data Breach involved records of students who attended California public schools, the Nationwide Class consists principally of current and former California students, including former students who now reside in other States.

58. Excluded from the Classes are: Defendant and its officers, directors, and employees; any entity in which Defendant has a controlling interest; Defendant's affiliates, legal representatives, successors, and assigns; and the judicial officers to whom this action is assigned, their immediate families, and their staff.

59. Plaintiff reserves the right to modify or amend the definitions of the proposed Classes, including by adding subclasses, before the Court determines whether certification is appropriate.

60. **Numerosity (Rule 23(a)(1)).** The Classes are so numerous that joinder of all members is impracticable. The Data Breach affected all students enrolled in California public schools in the three previous school years, among others—millions of individuals. The identities of Class Members are ascertainable from records maintained by ETS and CDE, which have already been used to send notices of the Data Breach.

61. **Commonality and Predominance (Rule 23(a)(2) and (b)(3)).** Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These common questions include:

(a) whether ETS owed Plaintiff and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their Student Data;

(b) whether ETS's data security practices, including its practices with respect to the SFTP Site, were reasonable and consistent with industry standards;

(c) whether ETS failed to require multi-factor authentication or otherwise adequately restrict access to the SFTP Site;

(d) whether ETS failed to detect the unauthorized access in a timely manner;

(e) whether ETS retained Student Data longer than necessary;

(f) whether ETS breached its duties to Plaintiff and Class Members;

(g) whether ETS's conduct was a proximate cause of the Data Breach;

(h) whether ETS was unjustly enriched;

(i) whether ETS's conduct violated the California Constitution and the Unfair Competition Law;

(j) whether Plaintiff and Class Members are entitled to damages, restitution, or other monetary relief, and the measure of such relief; and

(k) whether Plaintiff and Class Members are entitled to declaratory and injunctive relief.

62. **Typicality (Rule 23(a)(3)).** Plaintiff's claims are typical of the claims of the Classes. Plaintiff and every Class Member had Student Data maintained by ETS that was accessed and copied in the same Data Breach, as a result of the same alleged security failures.

63. **Adequacy (Rule 23(a)(4)).** Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has no interests antagonistic to those

of other Class Members and has retained counsel experienced in complex class actions, including data breach and privacy litigation.

64. **Superiority (Rule 23(b)(3)).** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class Members are small relative to the burden and expense of individual litigation against ETS, making it impracticable for Class Members to seek redress individually. Individual litigation would also create the risk of inconsistent judgments and would increase delay and expense to all parties and the courts. The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

65. **Rule 23(b)(2).** ETS has acted or refused to act on grounds generally applicable to the Classes—including by failing to implement reasonable security measures to protect Student Data that remains in its possession—so that final injunctive and declaratory relief is appropriate with respect to the Classes as a whole.

66. **Rule 23(c)(4).** In the alternative, particular issues—including whether ETS owed and breached a duty of care and whether ETS's security practices were reasonable—are appropriate for certification because their resolution would materially advance the disposition of this matter.

67. **Choice of Law.** California law applies to the claims of all Class Members. ETS collected and maintained the Student Data under a contract with a California state agency, for the purpose of administering California's statewide assessments to students enrolled in California public schools; the Student Data concerns students' enrollment in California schools; and ETS's relevant conduct was directed at California. California therefore has the most significant relationship to, and the greatest interest in, the claims asserted here. In the alternative, the common-law claims asserted on behalf of the Nationwide Class

arise under the laws of the States in which Class Members reside, and Plaintiff reserves the right to propose additional state subclasses. Plaintiff also pleads the common-law claims, in the alternative, on behalf of the California Subclass.

## VI. CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the California Subclass)**

68. Plaintiff realleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

69. ETS collected, received, maintained, and stored the Student Data of Plaintiff and Class Members in connection with its contract to administer California's statewide assessments.

70. By collecting, receiving, and maintaining the Student Data, ETS owed Plaintiff and Class Members a duty to exercise reasonable care in safeguarding and protecting that information from unauthorized access, disclosure, and theft. This duty included, among other things, the obligation to design, maintain, and test its security systems and the SFTP Site; to implement reasonable access controls, including multi-factor authentication; to monitor for and promptly detect unauthorized activity; to encrypt or otherwise protect Student Data at rest; and to retain Student Data no longer than necessary.

71. ETS's duty arose from, among other things, the special relationship between ETS and Plaintiff and Class Members. Plaintiff and Class Members—most of them minors—were required to participate in the statewide assessments ETS administers, and their Student Data was provided to ETS for the specific purpose of administering those assessments. ETS's handling of the Student Data was intended to affect Plaintiff and Class Members; harm to them from a breach was readily foreseeable; Plaintiff and Class Members suffered injury as a result

of the Data Breach; ETS's conduct was closely connected to that injury; ETS's security failures are morally blameworthy given the sensitivity of the Student Data and the vulnerability of the children to whom it pertains; and imposing a duty serves the policy of preventing future harm.

72. ETS's duty also arose from its own public representations that it maintains safeguards to prevent unauthorized access to personal information, and from the FTC guidance and industry security standards described in Section IV.D above, which reflect the standard of care applicable to entities that maintain sensitive personal information.

73. ETS was in the best position—indeed, the only position—to protect against the harm suffered by Plaintiff and Class Members. Plaintiff and Class Members had no ability to evaluate, control, or improve ETS's data security practices.

74. ETS breached its duty of care by failing to implement and maintain reasonable security measures, including the failures described in Section IV.D above, and by failing to detect the unauthorized access to the SFTP Site for nearly four months.

75. It was reasonably foreseeable to ETS that its failure to exercise reasonable care in safeguarding the Student Data would result in unauthorized access to and theft of that information, and in the injuries described herein.

76. But for ETS's negligent conduct, Plaintiff's and Class Members' Student Data would not have been compromised. ETS's negligence was a direct and proximate cause of the Data Breach and of Plaintiff's and Class Members' injuries.

77. As a direct and proximate result of ETS's negligence, Plaintiff and Class Members have suffered and will continue to suffer the injuries described in Section IV.F above, and are entitled to compensatory and consequential damages in an amount to be proven at trial.

**COUNT II**

**NEGLIGENCE PER SE**

**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the California Subclass)**

78. Plaintiff realleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

79. ETS's duties to use reasonable data security measures also arose under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect personal information. Various FTC publications and data security enforcement actions further form the basis of ETS's duties.

80. ETS's duties also arose under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, and its implementing regulations, 34 C.F.R. Part 99, which protect personally identifiable information from students' education records against unauthorized disclosure, including when that information is held by parties outside the educational agency.

81. Plaintiff and Class Members are within the class of persons the FTC Act and FERPA were intended to protect, as individuals whose personal information ETS collected, maintained, and was obligated to safeguard.

82. The harm that occurred as a result of the Data Breach—the unauthorized access to, copying, and disclosure of Plaintiff's and Class Members' Student Data—is the type of harm the FTC Act and FERPA were intended to guard against.

83. ETS violated Section 5 of the FTC Act and FERPA by failing to use reasonable measures to protect Plaintiff's and Class Members' Student Data and by failing to comply with applicable industry standards, as described herein. ETS's violations constitute negligence per se.

84. ETS further breached these duties by failing to design, adopt, implement, control, manage, monitor, update, and audit its processes, controls, policies, procedures, and protocols to comply with the applicable laws and to safeguard Plaintiff's and Class Members' Student Data within its possession, custody, and control.

85. As a direct and proximate result of ETS's negligence per se, Plaintiff and Class Members have suffered and will continue to suffer the injuries described in Section IV.F above, and are entitled to compensatory and consequential damages in an amount to be proven at trial.

**COUNT III**

**BREACH OF FIDUCIARY DUTY**

**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the California Subclass)**

86. Plaintiff realleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

87. By accepting, taking possession of, collecting, storing, and processing Plaintiff's and Class Members' highly sensitive Student Data, ETS formed a special relationship with Plaintiff and Class Members and became a guardian of that information.

88. ETS became a fiduciary with respect to the Student Data because, as alleged herein, it contracted with the State of California to receive, maintain, and process the Student Data of students—Plaintiff and Class Members—whose information was transmitted to ETS by virtue of their enrollment in California public schools, and ETS accepted custody of that information in confidence.

89. Plaintiff and Class Members, most of whom were minors when their information was collected, depended on ETS to protect their Student Data. They could not inspect or control ETS's security practices and could not protect the

information themselves, while ETS had superior knowledge of, and exclusive control over, the systems in which the Student Data was maintained.

90. In light of this relationship, ETS had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship, which includes safeguarding and protecting the Student Data.

91. ETS breached that duty by failing to properly protect the integrity of its systems containing Plaintiff's and Class Members' Student Data and by failing to safeguard the Student Data it maintained.

92. As a direct and proximate result of ETS's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will continue to suffer the injuries described in Section IV.F above, and are entitled to compensatory and consequential damages in an amount to be proven at trial.

## COUNT IV

## UNJUST ENRICHMENT

**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the California Subclass)**

93. Plaintiff realleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

94. Plaintiff pleads this claim as a quasi-contract claim seeking restitution.

95. Plaintiff and Class Members conferred a benefit on ETS in the form of their Student Data, which ETS received, processed, and maintained, and which ETS used to perform the compensated assessment services it provides under its contract(s) with the State of California to administer the CAASPP and ELPAC.

96. ETS knew of and appreciated these benefits. ETS could not have earned revenue under those contract(s) without receiving, processing, and maintaining the Student Data.

97. Upon information and belief, ETS retained the benefit of its use of the Student Data while avoiding the costs of implementing reasonable security measures to protect it.

98. Under principles of equity and good conscience, ETS should not be permitted to retain, at Plaintiff's and Class Members' expense, the benefit of the security costs it avoided while using their Student Data.

99. Plaintiff and Class Members lack an adequate remedy at law for the portion of their injury that consists of ETS's retention of benefits it did not earn.

100. Plaintiff and Class Members are entitled to restitution of the benefits ETS unjustly retained at their expense, in an amount to be determined at trial.

**COUNT V**

**DECLARATORY AND INJUNCTIVE RELIEF**

**28 U.S.C. § 2201, *et seq.***

**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the California Subclass)**

101. Plaintiff realleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

102. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court is authorized to declare the rights and legal relations of the parties and to grant further necessary or proper relief. 28 U.S.C. § 2202.

103. An actual controversy has arisen in the wake of the Data Breach regarding ETS's present and prospective duties to reasonably safeguard the Student Data, and whether ETS is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further breaches. Upon information and belief, ETS continues to maintain the Student Data, and Plaintiff and Class Members remain at imminent risk of further compromise.

104. Plaintiff therefore seeks a declaration that (a) ETS owes a legal duty to use reasonable care to secure the Student Data; and (b) ETS's existing data security measures do not comply with that duty.

105. Plaintiff further seeks corresponding injunctive relief requiring ETS to, among other things:

(a) implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of the Student Data;

(b) require multi-factor authentication and other appropriate access controls for all systems, including any SFTP or file-transfer systems, that store or transmit Student Data;

(c) encrypt Student Data at rest and in transit;

(d) implement logging, monitoring, and alerting sufficient to promptly detect unauthorized access and anomalous data transfers;

(e) consistent with applicable legal and contractual retention requirements, delete Student Data that is no longer necessary for the purposes for which it was collected, and promptly remove files from file-transfer systems once transfers are complete;

(f) engage independent third-party security auditors to conduct periodic penetration testing and audits, and promptly remediate identified deficiencies;

(g) train its personnel regarding credential security and the handling of Student Data; and

(h) provide Class Members with identity-protection and credit-monitoring services, including services appropriate for minors, for a period commensurate with the risk created by the Data Breach.

106. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and lack an adequate remedy at law in the event of another

breach of ETS's systems. The risk of another breach is real, immediate, and substantial, and the resulting injuries—including further loss of privacy—are not readily quantifiable.

107. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to ETS if an injunction is issued. The cost to ETS of complying with an injunction requiring reasonable security measures is modest, and ETS has a pre-existing legal obligation to employ such measures.

108. Issuance of the requested injunction will not disserve the public interest. To the contrary, it will serve the public interest by protecting the sensitive information of millions of students.

**COUNT VI**

**INVASION OF PRIVACY**

**Cal. Const. art. I, § 1**

**(On Behalf of Plaintiff and the California Subclass)**

109. Plaintiff realleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

110. Article I, section 1 of the California Constitution provides that all people have inalienable rights, among which is the right of pursuing and obtaining privacy. The right to privacy guaranteed by the California Constitution is enforceable against private entities.

111. Plaintiff and California Subclass Members have a legally protected privacy interest in their Student Data, including information concerning their identities, home addresses, dates of birth, disabilities, Section 504 status, country of origin, English-learner status, eligibility for programs serving homeless, migrant, low-income, and military-connected students, and assessment results. This information is among the most private information about a child.

112. Plaintiff and California Subclass Members had a reasonable expectation of privacy in their Student Data. They provided that information—or

had it provided on their behalf—solely so that they could attend public school and participate in mandatory statewide assessments, and they reasonably expected that ETS would protect it from unauthorized access and would not expose it to criminals.

113. ETS's conduct resulted in a serious invasion of privacy. Upon information and belief, ETS maintained highly sensitive information about millions of children on an internet-accessible SFTP Site that could be accessed with a single compromised login credential, and failed to detect a months-long intrusion, resulting in the unauthorized access to and copying of Plaintiff's and California Subclass Members' sensitive information. ETS's conduct was highly offensive and constituted an egregious breach of social norms, particularly given that the victims are overwhelmingly children who had no choice but to provide their information.

114. Plaintiff and California Subclass Members did not consent to ETS's disclosure of their Student Data to unauthorized third parties.

115. As a direct and proximate result of ETS's invasion of their privacy, Plaintiff and California Subclass Members have suffered injury, including loss of privacy, emotional distress, and the other harms described herein, and are entitled to damages and appropriate equitable relief.

**COUNT VII**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

**Cal. Bus. & Prof. Code § 17200, *et seq.***

**(On Behalf of Plaintiff and the California Subclass)**

116. Plaintiff realleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

117. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

118. ETS is a "person" within the meaning of California Business and Professions Code § 17201.

119. **Unlawful.** ETS engaged in unlawful business acts and practices by violating, among other laws, California's Student Online Personal Information Protection Act, Cal. Bus. & Prof. Code § 22584(d)(1), as alleged herein.

120. California's Student Online Personal Information Protection Act ("SOPIPA") requires an "operator" to implement and maintain reasonable security procedures and practices appropriate to the nature of the covered information, and to protect that information from unauthorized access, destruction, use, modification, or disclosure. Cal. Bus. & Prof. Code § 22584(d)(1). An "operator" is the operator of an internet website, online service, online application, or mobile application with actual knowledge that it is used primarily for K-12 school purposes and was designed and marketed for K-12 school purposes, *id.* § 22584(a)(7), and an "online service" includes cloud computing services, *id.* § 22584(a)(6). Upon information and belief, ETS operates online services and applications used to administer and support the CAASPP and ELPAC—including the SFTP Site and related systems used to transmit student information—that ETS knows are used primarily for, and were designed and marketed for, K-12 school purposes. The Student Data is "covered information," which includes information that identifies a pupil, such as the pupil's name, home address, test results, special education data, disabilities, socioeconomic information, and pupil identifiers. *Id.* § 22584(a)(2)(C). ETS violated SOPIPA by failing to implement and maintain reasonable security procedures and practices to protect the Student Data, as alleged herein.

121. **Unfair.** ETS engaged in unfair business acts and practices by failing to implement reasonable security measures to protect the Student Data of millions of children. The gravity of the harm resulting from ETS's conduct outweighs any utility of the conduct; ETS's conduct offends established public policy reflected

in California's student privacy laws, including the Student Online Personal Information Protection Act, Cal. Bus. & Prof. Code § 22584; and the resulting injury is substantial, was not outweighed by any countervailing benefit to consumers or competition, and could not reasonably have been avoided by Plaintiff and California Subclass Members, who had no choice but to have their information provided to ETS.

122. As a direct and proximate result of ETS's unlawful and unfair practices, Plaintiff and California Subclass Members suffered injury in fact and lost money or property, including out-of-pocket costs incurred to mitigate the effects of the Data Breach and the loss of their legally protected interest in the confidentiality of their personal information.

123. Plaintiff and California Subclass Members lack an adequate remedy at law. Money damages are retrospective and cannot address ETS's ongoing failure to implement adequate data security, which continues to expose Plaintiff and California Subclass Members to the risk of further breaches while ETS retains their Student Data. Injunctive relief requiring ETS to implement reasonable security practices is a prospective remedy that is not available at law. Restitution, moreover, may be available in circumstances where damages are not, and may be calculated differently.

124. Plaintiff and California Subclass Members seek all relief available under California Business and Professions Code § 17203, including restitution and injunctive relief, together with attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant as follows:

A. Certifying the Nationwide Class and the California Subclass as defined herein, appointing Plaintiff as class representative, and appointing Plaintiff's counsel as class counsel;

B. Declaring that Defendant's conduct as alleged herein was unlawful;

C. Awarding Plaintiff and Class Members compensatory and consequential damages, in an amount to be determined at trial;

D. Awarding restitution and disgorgement as permitted by law;

E. Awarding declaratory and injunctive relief as requested herein, including requiring Defendant to implement and maintain reasonable data security practices, to delete Student Data it no longer needs, and to provide adequate identity-protection and credit-monitoring services to Class Members;

F. Awarding pre-judgment and post-judgment interest as permitted by law;

G. Awarding reasonable attorneys' fees and costs, including under California Code of Civil Procedure § 1021.5 and as otherwise permitted by law; and

H. Granting such other and further relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: October 17, 2026

Respectfully submitted,

**AHDOOT & WOLFSON, PC**

By: *<u>/s/ Tina Wolfson</u>*

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)

rahdoot@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Attorneys for Plaintiff PL01 and the Proposed Classes*